FILED

APR 3 0 2008

CLERK
United States Bankruptcy Court
San Jose, California

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN JOSE DIVISION

In re

3DFX INTERACTIVE, INC.,

            Debtor.

_____

WILLIAM A. BRANDT, JR., TRUSTEE,

            Plaintiff,

vs.

nVIDIA CORPORATION, a Delaware
Corporation; et al.,

            Defendant(s).

_____/

Case No. 02-55795-RLE

Chapter 11

Adv. Proc. No. 03-5079

### MEMORANDUM DECISION AFTER TRIAL

    Before the Court is the First Amended Complaint (the
"Complaint") filed by William A. Brandt, Jr., the Trustee of

[3dfx.nvidia.decis.4.08.]          -1-

the above-captioned chapter 11 estate of 3dfx Interactive, Inc. (the "Trustee" and "3dfx"), against nVidia Corporation and nVidia U.S. Investment Company (collectively, "nVidia") for avoidance of a fraudulent conveyance. This phase of the case has been tried and submitted for decision.

The Trustee is represented by Peter G. Bertrand, Richard C. Darwin and Kim Y. Arnone of Buchalter Nemer. nVidia is represented by Robert P. Varian, Karen Johnson-McKewan and James N. Kramer of Orrick, Herrington & Sutcliffe LLP.

This Memorandum Decision constitutes the Court's findings of fact and conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

## I. FACTS

**A. Procedural Background**

**1. The Adversary Proceeding**

3dfx filed this chapter 11 case on October 15, 2002, and the Trustee was appointed January 24, 2003. On February 24, 2003, the Trustee commenced this adversary proceeding.

The Complaint states four claims for relief based on California Civil Code §§ 3439.04(a) and (b) and § 3439.05 (California's Uniform Fraudulent Transfer Act (the "UFTA")), applicable here through Bankruptcy Code § 544(b)(1). The Trustee alleges that in the transaction between nVidia and 3dfx (the "Transaction") documented in the Asset Purchase Agreement dated December 15, 2000 (the "APA"), nVidia paid less than reasonably equivalent value for what it received. nVidia responded to the Complaint and the parties have engaged in extensive discovery.

[3dfx.nvidia.decis.4.08.]                    -2-

1    In August 2005, the Trustee filed a motion for summary
2    judgment which nVidia opposed.  On December 22, 2005, the
3    Court issued an order granting in part and denying in part the
4    Trustee's motion (the "Summary Judgment Order").  Docket no.
5    172.  The Summary Judgment Order provides that judicial
6    estoppel precludes nVidia from asserting in this action that
7    the "transaction value" is anything other than $108 million.
8    The Court denied summary judgment regarding what specific
9    assets were transferred in the Transaction and the value, if
10   any, to be ascribed to them.

11   **2. The Questions to be Tried**

12   On January 26, 2007, the parties filed a Joint Statement
13   of Legal and Factual Questions for Trial (the "Joint
14   Statement").  Docket no. 237.  On January 31, 2007, the Court
15   issued a Pre-Trial Order establishing a schedule for trial and
16   the manner in which this valuation phase of the trial would be
17   handled.  Docket no. 253.  A timed trial took place between
18   March 21, 2007 and April 5, 2007.  Post-trial briefing is
19   complete and the matter is ready for decision.

20   Pursuant to the Joint Statement and Pre-Trial Order, the
21   issues to be determined at this phase of the case are:

22   In the Transaction:

23   1.  What was transferred and/or surrendered by 3dfx to
24   nVidia?

25   2.  With respect to what was transferred and/or
26   surrendered, what is subject to avoidance under applicable
27   state and federal fraudulent transfer statutes?

28   3.  With respect to what is identified in the answer to

[3dfx.nvidia.decis.4.08.]                    -3-

the second question, what was the fair market value as of the date it was transferred and/or surrendered?

    4.  Was the $70 million paid by nVidia reasonably equivalent to the fair market value identified in the answer to the third question?

**3. The Witnesses**

    nVidia offered direct testimony by declarations from the following witnesses which were admitted into evidence:

    1.  Jen-Hsun Huang, president and chief executive officer of nVidia.

    2.  Christine Hoberg, former chief financial officer of nVidia.

    3.  Alex Leupp, former president and chief executive officer of 3dfx.

    4.  Phil Carmack, senior vice president of the handheld GPU business unit of nVidia, former vice president of hardware engineering at 3dfx and former executive vice president of research and development at 3dfx.

    5.  Paul D. Carmichael, former in-house counsel for nVidia.

    6.  Mark Maxson, a principal in the valuation practice at Deloitte & Touche.

    7.  Mark Waissar, former vice president at Morgan Stanley.

    nVidia offered direct testimony by declarations and reports from the following expert witnesses which were admitted into evidence:

    1.  Roger J. Grabowski, regarding valuation issues.

[3dfx.nvidia.decis.4.08.]        -4-

2. Roman Weil, regarding accounting issues.

3. Jon G. Peddie, regarding graphics industry issues.

4. Charles D. Murphy, III, regarding investment banking issues.

5. Matthew R. Lynde, regarding patent damages issues.

The Trustee offered direct testimony by declarations and reports from the following expert witnesses which were admitted into evidence:

1. Richard Ferraro, regarding industry issues.

2. Michael J. Wagner, regarding valuation issues.

The Trustee also offered testimony by designated deposition excerpts for Paul Carmichael, Richard Heddelson, Steve Pettigrew as part of his case-in-chief.

The Court heard testimony from nVidia's experts Messrs Weil, Peddie, and Murphy and from the Trustee's experts Messrs Ferraro and Wagner.

The Court also heard testimony from Jen-Hsun Huang, Christine Hoberg, Alex Leupp, Mark Maxson, and Richard Cording (the former controller of nVidia).

Designated deposition excerpts were also admitted into evidence. Before trial, both parties filed evidentiary objections to certain parts of the declarations and experts' reports. The Court ruled on these objections, in part, before trial began.[1] To the extent the Court relies upon any evidence for which there may have been a pending objection, any such objection is overruled.

_____

[1] See generally Docket nos. 311-344, 366, 372, 382.

[3dfx.nvidia.decis.4.08.]                    -5-

**B. Background Regarding the Parties**

**1. The Brief Life of 3dfx**

3dfx was a publicly traded semiconductor company incorporated in California in 1994. Its initial public offering took place in April 1997. 3dfx described itself as part of the world of "interactive electronic entertainment" that had started with coin-operated arcade games, then moved into home entertainment through the advent of inexpensive, dedicated home game consoles that attached to televisions and then progressed to games playable on personal computers. Ex. 5011, pp. 4-5.[2] 3dfx claimed that its products were used in more than 700 titles for personal computer games and more than 20 titles for arcade games. Game titles included *Everquest*, *Alien vs. Predator*, *Hydro Thunder*, and *Savage Quest*. Ex. 5011, p. 10.[3]

3dfx first shipped its graphics products (known as the Voodoo Graphics chipset) in September 1996 and introduced subsequent versions in 1997, 1998 and 1999 (with variations on the Voodoo name, such as the Voodoo 2, 3, 4, and 5, Voodoo Rush and Voodoo Banshee). 3dfx's target market had historically been the retail market for add-in graphics cards and 3dfx had devoted significant energy to establishing 3dfx

---

[2] Well-known manufacturers of these game consoles include Sony Corporation, Nintendo Corporation, and Sega Enterprises, Ltd. Successive generations of these game consoles have been introduced for many years.

[3] References to the reporter's transcript of trial proceedings will be as follows: "RT __." References to Exhibits will be as follows: "Ex. __."

[3dfx.nvidia.decis.4.08.]                    -6-

and Voodoo as brand names in the retail market. Ex. 5011, pp. 6-8. At the time of the Transaction, Voodoo Rampage was in development but had not been completed. Voodoo Rampage had been "taped out" in early December 2000 but it could have been as much as another year before it would have been ready for commercial exploitation. RT 1503-1505 and 1319-1321.

### 2. 3dfx Merger with STB Systems, Inc.

Before May 1999, 3dfx was what is known as a "merchant chip" business – it designed and sold graphics chips to a variety of companies who then used the chips in their own products. In May 1999, 3dfx completed its acquisition of STB Systems, Inc. ("STB"), a Texas based graphics board company with a manufacturing facility in Mexico. Ex. 5011, pp. 3, 14. The purpose of the 3dfx/STB merger was to allow 3dfx an avenue to deliver the 3dfx graphics chip directly to the retail/distributor market on a graphics board designed and built by 3dfx rather than on graphics cards designed by various third party companies. Ex. 5011, p. 3. The acquisition of STB fundamentally changed 3dfx's business strategy. Alex Leupp, former chief executive officer of 3dfx, characterized the STB acquisition as a "mistake." Ex. BV, ¶6.

Jon Peddie,[4] nVidia's industry expert, also described the STB merger as an ill-advised strategic decision:

//

---

[4] See Ex. BZ, ¶¶3-9 for details regarding Mr. Peddie's credentials. Mr. Peddie is the principal of a technically oriented marketing and management consulting firm that issues market reports and publishes a bi-weekly report on computer graphics and emerging trends in digital media technology.

Case: 03-05079   Doc# 499   Filed: 04/30/08   Entered: 05/01/08 10:05:14   Page 7 of 41

> This change in 3dfx's business and product offerings
> brought it into direct competition with companies that
> had previously been major customers. Although this
> decision was intended to simplify the design process and
> shorten product cycles by putting its chips in a single
> board design . . . 3dfx's transition from a merchant chip
> company to an add-in board company undermined 3dfx's
> customer relationships and reduced its sales.

Ex. BZ, ¶15.

Following the merger, certain operating functions of each company were combined in an attempt to achieve operating efficiency. Various engineering functions were merged to coordinate the graphics chip design process and graphics board design process. The sales and marketing operations were unified to address customer needs, particularly in the retail/distribution channel. Ex. 5011, p. 3. However, as a result of the merger, 3dfx lost two customers who had accounted for 58% of its total revenues for fiscal year 1998. 3dfx was unable to replace the lost revenues attributable to these two significant customers. STB revenues also declined after the merger because STB was unable to sell boards incorporating graphics chips from other companies. Ex. 5011, p. 21; Ex. BV, ¶¶5-6.

**3. 3dfx Merger with Gigapixel Corporation**

In July 2000, 3dfx completed a merger with Gigapixel Corporation ("Gigapixel"). One apparent rationale for this merger was to expand the number of engineers working for 3dfx. Gigapixel had about 40 graphics engineers at the time of the merger who became 3dfx employees. Ex. BV, ¶7. Mr. Leupp testified that the main purpose of 3dfx acquiring Gigapixel was Gigapixel's relationship with Microsoft and the X-Box

[3dfx.nvidia.decis.4.08.]                -8-

1   (then in development), and Gigapixel's innovative approach to
2   designing graphics chips.  RT 1291.  Mr. Peddie described the
3   Gigapixel merger as a "desperate move" which was difficult to
4   link with a rational business purpose.  Ex. BZ, ¶15.

5       **4. Relationship between nVidia and 3dfx**

6       Historically, nVidia and 3dfx had developed a well-known
7   rivalry with each other in the small field they occupied.  As
8   Mr. Leupp, described it, "[b]efore 3dfx bought STB Systems,
9   3dfx and nVidia had been serious competitors with one another.
10  The two companies were rivals down to the bone, and I
11  understood that the culture among our engineers was hostile to
12  nVidia."  Ex. BV, ¶27.

13      By the fall of 2000, nVidia did not view 3dfx as a direct
14  competitor because following the STB merger, 3dfx sold only
15  its own boards incorporating its own graphics chips.  Ex. BT,
16  ¶11.  Jen-Hsun Huang, nVidia's chief executive officer,
17  testified that nVidia's market focus was on selling its chips
18  to original equipment manufacturers, whereas 3dfx's focus was
19  primarily on selling its chips as part of add-in boards sold
20  directly in the retail channel.  At the time, the end-users of
21  nVidia's chips were purchasers of computers that already
22  contained an nVidia graphics chip.  Thus, the end-users of
23  3dfx's chips were people who purchased an entire graphics
24  board containing 3dfx chips from retailers and then added
25  those boards to their computers.  Ex. BT, ¶5; Ex. 5011, p. 15.

26      3dfx and nVidia were also suing each other for patent
27  infringement (collectively, the "Patent Litigation").  In
28  September 2000, the District Court hearing the Patent

Case: 03-05079   Doc# 499   Filed: 04/30/08   Entered: 05/01/08 10:05:14   Page 9 of
41

Litigation issued a ruling favorable to 3dfx, largely adopting the 3dfx position and largely rejecting nVidia's. Ex. 53; RT 187.

### 5. 3dfx's Financial Problems

In the beginning of 2000, 3dfx had approximately 650 employees. Approximately 265 of these employees were engineers. 3dfx's Mexican subsidiary also had roughly 1200 employees working in its Juarez, Mexico board manufacturing facility. 3dfx had business premises in San Jose, California and Richardson, Texas. Its graphics chips were manufactured in Taiwan. Ex. 5011, p. 16.

Mr. Peddie testified that although 3dfx was not a small company, its competitors, including nVidia, were larger and more sophisticated and also had stronger financial backing. Because of 3dfx's limitations, it fell behind the technology cycle, produced inferior products, and its operation as a merchant chip company was doomed. By the fall of 2000, 3dfx had effectively designed itself into a corner by committing to an outmoded chip architecture that was not scalable or economical. The company did not recognize the importance of single chip compatibility, and ignored the importance of industry compatibility. Ex. BZ, ¶¶12-13.

3dfx's SEC filings confirm this general assessment as did Mr. Leupp. Ex. BV, ¶¶8-9; Ex. 5011, p. 35; Ex. 5054, pp. 19-23.

By the time of the Transaction on December 15, 2000, 3dfx had sustained losses each quarter since the quarter ending

Case: 03-05079    Doc# 499    Filed: 04/30/08    Entered: 05/01/08 10:05:14    Page 10 of 41

April 30, 1999.[5]  By the end of the third quarter of 2000, 3dfx was also experiencing high inventory expenses, declining margins and slowing demand for its products.  Ex. BV, ¶8; Ex. BU, ¶8.

In its 10-Q filed on December 20, 2000, 3dfx reported a net loss of $291.5 million for the nine months ending October 31, 2000, and reported that during the three months ending October 31, 2000, it had recorded a charge of $117 million for the impairment of goodwill and other intangibles.  Ex. 5054, pp. 3, 9-10.

By the fall of 2000, not only had 3dfx suffered six consecutive quarterly losses, but it also had essentially run out of cash, and had even invited bankruptcy counsel to address the November 20, 2000 board meeting.  Ex. 5027.  According to Mr. Leupp, whether or not 3dfx signed a deal with nVidia on December 15, 2000, 3dfx would have found it necessary to lay off most, if not all, of its employees.  Ex. BV, ¶36.

## C. Events Preceding the Transaction

### 1. 3dfx Retains Robertson Stephens

---

[5] 3dfx had reported a net loss of $2.1 million for the quarter ending April 30, 1999; a net loss of $11.6 million for the quarter ending July 31, 1999; a net loss of $17.6 million for the quarter ending October 31, 1999; a net loss of $31.9 million for the quarter ending January 31, 2000.  Ex. 5011, p. 27.  3dfx reported a net loss of $12 million for the quarter ending April 30, 2000, a net loss of $100 million for the quarter ending July 31, 2000.  Ex. 5015, p. 2.  3dfx reported a net loss of $178 million for the 3 months ending October 31, 2000.  Ex. 5054, p. 2.  3dfx reported a net loss of $63 million for fiscal year 2000.  Ex. 5065, p. 3.

[3dfx.nvidia.decis.4.08.]                    -11-

In September 2000, 3dfx decided to try to sell its board business assets and retained Houlihan Lokey Howard & Zukin to advise it in that effort. In October 2000, 3dfx also retained the investment banking firm of Robertson Stephens to conduct a search to identify parties interested in either a strategic or financial transaction with 3dfx. Robertson Stephens was well recognized at the time as one of the premier investment banking firms for technology companies such as 3dfx.[6] 3dfx management and Robertson Stephens gave information to numerous parties, several of whom signed confidentiality agreements and received detailed information regarding 3dfx. Ex. 5057, pp. 42-43.

3dfx also explored several restructuring alternatives, including selling the board business assets and returning to its previous model of designing and selling graphics chips, selling the board manufacturing assets in Mexico, and selling the stock of STB. 3dfx approached several companies, including Intel, ATI, and AMD, regarding potential transactions. None of these companies were interested. Ex. BV, ¶¶11-18.

**2. nVidia Retains Morgan Stanley**

Following contact initiated by 3dfx in September 2000, nVidia indicated its interest in exploratory discussions. Ex. BT, ¶9. Around this same time, nVidia retained Morgan Stanley

---

[6] Mr. Peddie described Robertson Stephens at the time as "widely recognized as one of the premier - and perhaps the premier - investment bank/financial advisor for West Coast technology firms such as 3dfx." Ex. BZ, ¶18.

[3dfx.nvidia.decis.4.08.]                    -12-

to assist it in the evaluation of a potential transaction with 3dfx.  Ex. CE, ¶¶13-17.  On or about November 20, 2000, nVidia and 3dfx entered into a letter agreement relating to the treatment of confidential information (the "Non-Disclosure Agreement").  Ex. 5026.

In late November 2000, Morgan Stanley provided the nVidia board of directors with its analysis of a potential transaction between 3dfx and nVidia (the "Project Titan Materials").  Ex. 5028.[7]  Mark Waissar, who led the Morgan Stanley team working on the assignment, described this presentation to the nVidia board as reflecting a preliminary analysis period during which Morgan Stanley evaluated 3dfx's entire business because Robertson Stephens had requested that nVidia evaluate a purchase of the entire company, and Robertson Stephens did not believe that a partial purchase of assets would be feasible.  Accordingly, the presentation primarily contemplated a merger structure between nVidia and 3dfx.  Ex. CB, ¶¶12-13.

In the Project Titan Materials, Morgan Stanley expressed its preliminary view that 3dfx's liabilities exceeded its assets and that 3dfx had little or no enterprise value.  However, the presentation also stated that other off-balance sheet assets including 3dfx's engineering workforce had

---

[7] Ex. 5028 was filed under seal pursuant to a protective order and remains sealed; it was admitted for the limited purpose of disclosing Morgan Stanley's advice.  Testimony regarding Ex. 5028 and Morgan Stanley's role in the Transaction are not sealed.  Duplicate versions of Ex. 5028 designated as Ex. AB and Ex. 66, also remain sealed.  See Docket no. 490.

[3dfx.nvidia.decis.4.08.]                    -13-

positive theoretical equity value which nVidia might derive in a merger. Ex. CB, ¶¶14-15.

One part of the Project Titan Materials suggested a hypothetical net equity value for 3dfx between $50 million to $125 million. This net equity value, in a merger context, was premised on (i) assigning a value of $1 million to $1.5 million per engineer for 75 - 100 engineers; (ii) the present value of a net operating loss tax shield of $12 million; (iii) a negative net asset value of $27 million; and (iv) closing and transaction costs of $10 million. In a section entitled "Transaction Headcount Multiples," Morgan Stanley provided a summary of seven change of control transactions involving technology companies for which a "per engineer" value for the acquisition or merger was derived based on the reported transaction price. The explanation for this data stated "[a]ssuming that 50% of the aggregate value is based on technology value, an appropriate aggregate value/engineer multiple would be in the range of $1.00MM - $1.5MM." Ex. 5028, p. 13.

Mr. Waissar testified that because of 3dfx's financial condition, Morgan Stanley could not implement a discounted cash flow valuation of the business, a net income analysis, an operating income analysis, a gross margin analysis or a revenue analysis. Instead, Morgan Stanley relied primarily on the "theoretical valuation of intangibles." Mr. Waissar testified that this approach is removed from a profit and loss analysis, which will typically yield more reliable data. This preliminary valuation analysis was intended to give nVidia

Case: 03-05079    Doc# 499    Filed: 04/30/08    Entered: 05/01/08 10:05:14    Page 14 of 41

certain parameters which it could use to consider what a merger with 3dfx might be worth to nVidia.  Ex. CB, ¶¶15-17.

### 3. Competing Offers: Via Technologies, Inc. and nVidia

As a result of the combined efforts of Robertson Stephens and 3dfx management, two offers emerged: one from Via Technologies, Inc. ("Via") and one from nVidia.[8]

The December 7, 2000 Via term sheet describes an investment of a total of $40 million in secured convertible notes, with $15 million to be funded upon signing definitive documents and an additional $25 million to be funded on completion of certain engineering milestones.  The $15 million was to be secured by essentially all assets of 3dfx.  Under the Via proposal, 3dfx was required to terminate the add-in board business, dismiss a large number of employees and deliver a new chip design by a specified deadline.  Ex. G; Ex. BV, ¶19.

The December 7, 2000 nVidia term sheet describes an offer to purchase selected graphics chip assets for $100 million cash, subject to the limitation that a minimum of fifty-six of 3dfx's selected employees would accept employment offers from nVidia.  If fewer than fifty-six accepted offers, there would be a $1 million per employee reduction in the purchase price.

---

[8] Robertson Stephens had apparently advised interested parties that bids had to be submitted by December 4, 2000 and agreement had to be reached by December 15, 2000.  Mr. Waissar testified that he understood there were two reasons for this: 3dfx was in deteriorating financial condition and 3dfx had postponed announcing its quarterly financial results until December 15, 2000.  Ex. CB, ¶11; Ex. 5060, p. 43; Ex. CE, ¶31. nVidia's first term sheet was submitted in accordance with a December 4, 2000 deadline.  Ex. 5033.

[3dfx.nvidia.decis.4.08.]                    -15-

3dfx was to continue to exist following the closing and, pending the closing, the parties would enter into an employee services agreement pursuant to which nVidia would pay the salaries of certain 3dfx engineers while they worked on nVidia projects (the "Employee Services Agreement"). The term sheet also provided that the definitive agreement would contain a provision requiring 3dfx to apply the cash proceeds in a manner acceptable to nVidia. To implement this, a portion of the purchase price would be held in escrow following the closing. Ex. BD; Ex. CE, ¶20.

On December 9, 2000, the 3dfx board met to consider the competing offers from Via and nVidia. The 3dfx board minutes set the stage as follows:

> Given the fact that the company had no imminent production, over 700 creditors, a significant monthly cash burn rate and approximately $60 million in debt . . . the board of directors recognized that the company's precarious financial condition made it increasingly unlikely in the near term that it would be able to pay its debts as they become due and payable.

Ex. 5039.

The board first selected the Via proposal. However, one of the 3dfx board members informed nVidia that nVidia had time to submit a revised offer.[9] Ex. BV, ¶8; Ex. BT, ¶¶18-19.

On December 10, nVidia submitted a revised proposal which the 3dfx board voted to accept. Described in a term sheet dated December 11, 2000, this offer provided, *inter alia*, that (i) nVidia would purchase certain graphics related assets for

---

[9] Via was advised of this turn of events but dropped out of the bidding at this point. Ex. BV, ¶31.

[3dfx.nvidia.decis.4.08.]                    -16-

$60 million cash and one million shares of nVidia common stock
deliverable when 3dfx satisfied its liabilities and
obligations; (ii) 3dfx could monetize a portion of the stock
consideration if it certified that the monetization would
enable 3dfx to satisfy all of its liabilities and obligations;
(iii) 3dfx would continue as a stand-alone entity; (iv) nVidia
would provide a $15 million bridge loan to be funded upon
signing; (v) nVidia would set up a $15 million fund earmarked
to pay bonuses for engineers who accepted nVidia's employment
offers; (vi) following execution of definitive documents,
nVidia would deliver to 3dfx two lists of selected 3dfx
employees to whom nVidia intended to offer employment; and
(vii) the parties would enter into an Employee Services
Agreement so that prior to the closing, 3dfx employees would
work on nVidia projects at nVidia's expense.  Ex. 5041; Ex.
BT, ¶20; Ex. CE, ¶24.

**D. The Asset Purchase Agreement**

**1. Documentation for the Transaction**

Following the 3dfx board decision to accept the nVidia
offer, certain terms of the proposed asset purchase continued
to evolve.  The final documentation for the Transaction
included, *inter alia*, the APA, Voting Agreement, Credit
Agreement, Security Agreement, Patent License Agreement,
Patent Standstill Agreement, Trademark Assignment Agreement,
and a fairness opinion for 3dfx.  Exs. 5047-5049.[10]

---

[10] Defined terms used in the APA will be used consistently
herein.

[3dfx.nvidia.decis.4.08.]                    -17-

It is not entirely clear when certain provisions that are in the APA were added or when certain provisions in the December 11, 2000 term sheet were deleted from the Transaction. For example, nVidia's counsel Paul Carmichael testified that early in the negotiations, nVidia proposed that the parties dismiss the Patent Litigation upon signing the APA. 3dfx proposed that the Patent Litigation be dismissed upon closing of the Transaction and this is what the APA provides. Ex. CA, ¶27; Ex. 5047, p. 7. It is also unclear when 3dfx made the decision to dissolve pursuant to its Plan of Dissolution (as described in the APA). Ex. CA, ¶19; Ex. 5047, p. 1; Ex. 5060, p. 56. The Employee Services Agreement, described in early term sheets, was apparently deleted shortly before signing the APA on December 15, 2000, as was the $15 million bonus fund earmarked for the payment of bonuses to engineers. The cash was also increased from $60 million to $70 million. Ex. 5035; Ex. BD; Ex. 5041; Ex. CE, ¶27; RT 651-653, 734.

Certain provisions of the APA are relevant for a determination of the issues under consideration at this phase of the case.

Section 1.1 describes the Specified Assets to be sold as

> all of the properties, rights, interests, and other
> tangible and intangible assets (wherever located and
> whether or not required to be reflected on a balance
> sheet prepared in accordance with GAAP) . . . that are or
> were used in . . . or that otherwise directly or
> indirectly related to, the graphics business of the
> Seller Corporations (the 'Graphics Business').

Ex. 5047, p. 1.

3dfx is defined as the Seller and 3dfx and its

[3dfx.nvidia.decis.4.08.]                    -18-

subsidiaries are defined as the Seller Corporations.  Ex.
5047, pp. 1, A-6.

The Specified Assets are defined in § 1.1(a)-(i).  The
Specified Assets include, *inter alia*, (a) Patents, Patent
Applications, Trademarks, Tradenames; (b) Other Proprietary
Assets, (defined as all Proprietary Assets and goodwill of the
Seller Corporations, copyrights, trade secrets, know-how,
computer software, inventions, designs, drawings, existing and
in-development chip designs and related specifications, source
codes, verification and validation environments, manufacturing
specifications and databases, in-process research and
development, product reviews); (c) Inventory, Equipment, and
Other Tangible Assets; (d) Contracts; (e) Governmental
Authorizations; (f) Claims; (g) Other Assets (defined as
including existing and in development chip designs, related
specifications, source codes, customer lists); (h) Books and
Records; and (i) Proceeds.  Ex. 5047, pp. 1-3.  (The Court
will refer to the assets defined in §§ 1.1(a), (b), (g), (h)
as the Intellectual Property Assets.)

The APA also defines the Excluded Assets as those assets
on Exhibit C (subject to the Closing Agreement) that directly
and exclusively relate to the graphics board business of the
Seller.  Ex. 5047, p. A-3.  The Excluded Assets on Exhibit C
include the stock of the Seller Corporations, cash, and
accounts receivable.  Ex. 5047, p. nv45374.

Sections 1.2 and 1.3 of the APA describe the payment
terms.  In summary, nVidia agreed to pay $70 million cash at
Closing (the "Cash Consideration"), and subject to the

[3dfx.nvidia.decis.4.08.]                    -19-

conditions in § 1.3, to deliver one million shares of nVidia
common stock (the "Stock Consideration"). The essential
restriction on the Stock Consideration was that the Stock
Consideration was only deliverable upon completion of the
winding up of the business of 3dfx pursuant to its Plan of
Dissolution and upon certification that all Liabilities of the
Seller Corporations had been paid in full or otherwise
provided for in a manner satisfactory to nVidia. Upon certain
conditions, 3dfx was permitted to obtain an advance on the
Stock Consideration by monetizing up to a maximum of $25
million if this monetization was necessary and sufficient to
enable 3dfx to pay its Liabilities in full. Ex. 5047, pp. 3-
4.

Section 1.5 of the APA describes the $15 million credit
facility and the non-exclusive, perpetual fully-paid license
for all of the Patents (other than those involved in the
Patent Litigation) and the sale of the Trademarks and
Trademark Applications given in exchange for this bridge
financing. Section 1.6 provides for the stay of the Patent
Litigation pending closing. Ex. 5047, pp. 5-6.

Section 2.5 of the APA provides that the Specified Assets
collectively constitute all of the properties, rights,
interests and other tangible and intangible assets necessary
to enable the Seller to conduct the Graphics Business in the
manner in which the Graphics Business is currently being
conducted and in the manner in which the Graphics Business is
proposed to be conducted. Ex. 5047, p. 11.

Section 2.16 of the APA provides that the Disclosure

[3dfx.nvidia.decis.4.08.]                    -20-

Schedule accurately sets forth information regarding the employees of the Seller Corporations who perform services related to the Specified Assets or the Graphics Business. Ex. 5047, pp. 18-19. Schedule 2.16, dated December 15, 2000, lists approximately 300 names with salary information, but a later version of Schedule 2.16 states that after December 15, 2000, substantially all of Seller's employees were terminated. Ex. 5047, pp. nv45411-45418, nv45619-45626.

Section 4 of the APA describes the pre-closing covenants of 3dfx. Section 4.2(a) provides, in pertinent part, that 3dfx will: (i) preserve intact the current business organization relating to the Specified Assets and the Graphics Business; (ii) keep available the services of current employees relating to the Specified Assets and the Graphics Business; and (iii) maintain good relations and goodwill with all suppliers, customers, landlords, creditors, employees. Ex. 5047, pp. 26-28.

**2. nVidia's Perspective Regarding the Transaction**

Mr. Huang, nVidia's chief executive officer, testified that when nVidia first started discussing a possible transaction with 3dfx, nVidia believed that 3dfx would remain in the add-in board business and structured its first proposal on terms that would have made nVidia the exclusive supplier of chips to 3dfx. Because such a structure meant that 3dfx would no longer need engineers to design graphics chips, nVidia hoped to be able to hire a number of the best of them. However, because engineers were in short supply, nVidia also believed that the engineers would be in high demand by other

Case: 03-05079 Doc# 499 Filed: 04/30/08 Entered: 05/01/08 10:05:14 Page 21 of 41

companies and nVidia wanted to be able to recruit them before other companies did. Ex. BT, ¶12.

In late November and early December 2000, nVidia had asked for and obtained two lists of the 3dfx engineers containing information about their compensation and Phil Carmack's[11] subjective assessment of their skills. Exs. 142, 162; Ex. BU, ¶¶16-17.

According to Mr. Huang, hiring the 3dfx engineers was the true value of the Transaction. He testified that the purchase price that nVidia agreed to pay had nothing to do with any attempt to value the assets that 3dfx was selling to nVidia. nVidia did not conduct a formal appraisal of the assets before signing the APA because the value of the assets was not what drove nVidia's interest in doing the deal or the purchase price. According to Mr. Huang:

> The total consideration was competitively driven, *i.e.*, what 3dfx management was willing to accept, what we felt we could afford, and what it took to beat out Via. It was very competitive because 3dfx had business relationships with Via; in the past there had been talks of partnership arrangements. What was important to nVidia in this transaction was not the value of the assets that we were buying, but the opportunity to be first in line to recruit the 3dfx design engineers. We were willing to pay a premium over the value of 3dfx's assets to get that head start over other potential suitors for the 3dfx engineers.

Ex. BT, ¶¶24-25.

Mr. Huang also testified that when it was apparent that

---

[11] Phil Carmack, vice president of hardware engineering at 3dfx until 1998, at Gigapixel in 1999, and again at 3dfx as executive vice president of research and development following the Gigapixel merger. He became an nVidia employee following the Transaction. Ex. BU, ¶¶7, 21-25.

Case: 03-05079    Doc# 499    Filed: 04/30/08    Entered: 05/01/08 10:05:14    Page 22 of 41

3dfx planned to dissolve after the Transaction, nVidia wanted
to be sure that any dissolution was completed in a way that
did no harm to nVidia, or to nVidia's reputation for fair
dealing in the market, and did no harm to the creditors that
nVidia and 3dfx had in common.  Ex. BT, ¶37.

nVidia originally proposed to escrow the Stock
Consideration until 3dfx could certify that its creditors had
been paid in full.  However, 3dfx wanted to be able to use the
Stock Consideration to pay its creditors.  Because nVidia
wanted to use the Stock Consideration to motivate 3dfx to
complete the transaction quickly, nVidia agreed to let 3dfx
monetize an agreed maximum amount of $25 million to pay
creditors if 3dfx could certify that doing so would result in
full payment of its Liabilities.  Ex. BT, ¶27.

**E. Events Following December 15, 2000**

**1. 3dfx Announces the Transaction and the Termination of Employees**

On Friday, December 15, 2000, the parties signed the APA
and 3dfx management announced to its employees that the
company was shutting down and the employees would be
terminated.  Ex. BV, ¶39.  Phil Carmack testified that on
December 15, 2000, he received written notification that he
was being laid off.  He understood that his colleagues also
received this layoff notice.  On December 18, 2000, he
attended a presentation made by nVidia to certain of the
engineers at which nVidia presented employment offers.  Ex.
BU, ¶¶20-24.

Mr. Huang testified that he and other members of nVidia's

[3dfx.nvidia.decis.4.08.]                    -23-

management met with 3dfx employees in Northern California on
December 18, 2000 and then flew to Texas to meet with
employees there. Ex. BT, ¶33. nVidia representatives met
individually with the 3dfx employees nVidia wanted to recruit
and made offers to approximately 120 of them. These offers
included 10 percent pay increases, stock options and
incentives to accept promptly. Ex. BT, ¶33; Ex. CE, ¶¶35-37.

Mr. Huang was confident that he would be able to persuade
3dfx engineers to accept nVidia's offers. RT 131, RT 167-168.
Consistent with Mr. Leupp's view of historical animosity
between the two groups of engineers, Christine Hoberg,
nVidia's chief financial officer at the time, testified that
other members of nVidia management did not share Mr. Huang's
confidence and were very nervous about the recruiting process.
She testified that some of the engineers viewed Mr. Huang as
Darth Vader. RT 768.

nVidia ultimately hired 107 former 3dfx employees, most
of whom were engineers. They began working at nVidia in early
January 2001. Ex. BU, ¶¶19-25; Ex. BT, ¶¶33-34.

**2. nVidia Obtains Regulatory Approval**

In order to obtain the required regulatory approval of
the Transaction,[12] nVidia filed a Notification and Report Form
for Certain Mergers and Acquisitions with the Department of
Justice and the Federal Trade Commission as required by the
Hart-Scott-Rodino Antitrust Improvement Act of 1976 (the "HSR

---

[12] Section 7A of the Clayton Act, 15 U.S.C. § 18a (1996),
and the rules promulgated thereunder.

1  Notification"). Ex. 84.

2      Pursuant to § 801.10 of the Code of Federal Regulations,
3  the value of the assets listed on the HSR Notification is to
4  be either the fair market value or the acquisition price, if
5  the acquisition price has been determined and if it is greater
6  than the fair market value. 16 C.F.R. § 801.10 (2002). The
7  HSR Notification states that nVidia is acquiring certain
8  assets of 3dfx relating to its graphics business with an
9  approximate value of $108 million. The $108 million was based
10  on the $70 million in Cash Consideration and the value of the
11  Stock Consideration as of December 15, 2000. Ex. 5064, p. 8.
12  After approximately 30 days, nVidia obtained regulatory
13  approval of the Transaction. Ex. 213.

14      **3. Deloitte & Touche LLP and KPMG LLP: nVidia's**
        **Accounting for the Transaction**
15
16      In December 2000, nVidia retained Deloitte & Touche LLP
17  ("D&T") to assist it with its allocation of the purchase price
18  to the assets acquired on a fair value basis for financial
19  reporting purposes. D&T produced a report dated May 3, 2001
20  (the "D&T Report"). Ex. 5064. Based upon the sum of the Cash
21  Consideration and the Stock Consideration it anticipated would
22  be paid, nVidia management told D&T that the fair value of the
23  assets to be acquired from 3dfx was approximately $107.4
24  million. Ex. 5064, p. 8. The phrase "fair value" used in the
25  D&T Report was the standard accounting definition for the
26  purchase price paid by a willing buyer to a willing seller.
27  Ex. CD, ¶7; Ex. U, pp. 71, 188-189.

28      nVidia management advised D&T that the net book value of

[3dfx.nvidia.decis.4.08.]                     -25-

1   the Inventory, Equipment and Other Tangible Assets was $2.4
2   million.  D&T believed this was reasonably representative of
3   the fair value of these assets and used this figure in its
4   purchase price allocation.  Ex. 5064, p. 25.

5       D&T attempted to allocate the remaining consideration
6   ($105 million) to intangible assets consisting of: (i) an
7   assembled workforce; (ii) Patents; (iii) Trademarks and Trade
8   Names; (iv) other intangibles in the nature of goodwill; (v)
9   developed technology; and (vi) in-process research and
10  development.  D&T concluded that the material contributory
11  intangible assets were an assembled workforce, and Trademarks
12  and Trade Names.  Ex. 5064, p. 28.

13      Based on discussions with nVidia management concerning
14  the composition of the assembled workforce, D&T determined
15  that its value would likely be material enough to warrant its
16  valuation for allocation purposes.  D&T allocated $3 million
17  to an assembled workforce of 107 employees based on the
18  avoided cost of recruiting this many high-caliber employees.
19  Ex. 5064, p. 28.  Mark Maxson, the D&T principal in charge of
20  the engagement, testified that there was economic benefit in
21  this opportunity to recruit the 3dfx engineers and the D&T
22  Report referred to this opportunity to recruit as an assembled
23  workforce.  Ex. CD, ¶11; Ex. 5064, pp. 20, 28.

24      D&T also believed that the 3dfx Trademark and Tradename
25  portfolio was sufficiently established and recognized by
26  retail consumers to justify attaching a value to it.  D&T used
27  the income approach and assigned a fair value of $11.310
28  million to the Trademark portfolio.  Ex. 5064, pp. 31-32.

[3dfx.nvidia.decis.4.08.]                    -26-

D&T attempted to allocate purchase price to the Patents and Patent Applications. nVidia management did not expect the Patents to generate any material third party license revenue and D&T stated that it could not attribute specific cash flows to the Patents due to the primarily defensive nature of the portfolio. D&T thus concluded that it could not estimate the value of the Patents with reasonable reliability. Ex. 5064, p. 31.

D&T also analyzed developed technology assets (described as proprietary assets, including trade secrets, source codes, and designs for existing chips) and in-process research and development (described as development assets not currently technologically feasible). D&T could not attribute individual cash flows to these assets, however, because nVidia had indicated it had no strategy to sell, lease, market or make alternative use of them. Accordingly, D&T concluded that the value of these assets was "inseparable from goodwill." Ex. 5064, p. 33.

Based on the $3 million allocated to avoided recruiting costs for the workforce, and the $11,310,000 allocated to Trademarks and Tradenames, D&T determined that the total fair value of the "identifiable intangible assets" was $14,310,000 and the fair value allocated to the tangible assets was $2,432,500. The remainder of the $107,437,500 assumed purchase price – $90.695 million – was allocated to "goodwill." The D&T Report defined goodwill as the "residual amount remaining unallocated to an identifiable intangible asset." Ex. 5064, p. 3.

[3dfx.nvidia.decis.4.08.]                    -27-

Mr. Maxson testified that D&T had no role in establishing the amount agreed to be paid by nVidia – D&T's only role was to assist in the accounting exercise that ended with the $90 million residual amount the D&T Report described as goodwill. Mr. Maxson stated:

> [T]he accounting concept [of] goodwill is usually an overpayment or synergies that are unique to the buyer, which is what causes [it] – excess purchase price is another term that's used sometimes . . . and that means consideration or deal value above and beyond the items that were actually received.

RT 1371. Mr. Maxson also testified that the $90 million in the goodwill category was a "residual number" and was not an opinion of the value of goodwill. RT 1371; Ex. CD, ¶16.

At some point in the due diligence process, nVidia retained the accounting firm KPMG LLP ("KPMG") to assist it in performing due diligence in connection with the Transaction. KPMG advised nVidia that applicable GAAP and SEC Rules[13] required nVidia to account for the Transaction as the acquisition of a business. This meant that nVidia had to include pro forma financial statements in the Form S-4 Registration Statement which was to be filed in January 2001. Exs. 5057, 5060.

Michael Dance, the KPMG audit partner, testified that if

---

[13] See Determining Whether a Nonmonetary Transaction Involves Receipt of Productive Assets or of a Business, Issue No. 98-3 (2000) (Emerging Issues Task Force) ("EITF No. 98-3") and Pro Forma Financial Statement Preparation Requirements, SEC Reg. S-X, Rule 11-01, 17 C.F.R. § 210.11-02(a) (2008). The EITF was formed by the SEC and the FASB in order to consider and respond to new issues in accounting practice. An EITF consensus is made part of GAAP until a later FASB pronouncement supersedes it. Ex. BX, ¶¶14, 16-17; Ex. P.

[3dfx.nvidia.decis.4.08.]                    -28-

acquired assets had the ability to generate revenues, the pro
forma information illuminated a transaction's continuing
impact on the buyer's financial statements.  In his view,
D&T's allocation of purchase price to goodwill and Trademarks
implied an ability to generate revenues and the allocation of
purchase price to a workforce implied an ability to conduct
business activities.  Ex. 274(d), pp. 35:9-15; 42:21-25; 43:1-
6; 54:1-10; 57:16-24; 58:1-11; 68:15-17; 71:23-72:1-12; Ex. T.

### 4. The Closing

On March 27, 2001, 3dfx held its annual shareholders'
meeting at which 3dfx obtained shareholder approval of the APA
and the Plan of Dissolution.  Ex. 5060; Ex. BV, ¶¶40-42.

nVidia believed it had no obligation to close the
Transaction because certain of the 3dfx representations and
warranties in the APA were inaccurate.  Ex. BT, ¶¶35-37.
Nonetheless, the parties entered into a Closing Agreement
pursuant to which nVidia paid the remaining $55 million in
Cash Consideration and the Transaction closed on April 19,
2001.  Ex. 5049, p. nv45010-45019; Ex. CE, ¶¶43-45.  The
parties also dismissed the Patent Litigation as the APA
contemplated.  Ex. 5049, p. nv45082-45087.  The Stock
Consideration was not provided to 3dfx due to the fact that it
did not satisfy the conditions stated in § 1.3 of the APA.
Ex. 5047, pp. 3-4.

Mr. Huang testified that by April of 2001, nVidia had
substantially realized the benefits it had hoped to achieve
from the Transaction.  nVidia had succeeded in hiring about
100 engineers, and in exchange for funding the $15 million

[3dfx.nvidia.decis.4.08.]                    -29-

bridge loan, had received an assignment of 3dfx's Trademarks and Tradenames, and an irrevocable license to all of 3dfx's Patents (other than those at issue in the Patent Litigation). Ex. BT, ¶¶35-37.

Mr. Huang stated that nVidia paid the balance of the Cash Consideration because it was important that nVidia be viewed in the marketplace as a fair company and nVidia wanted to do what it could to assure that 3dfx paid its creditors, several of whom were nVidia's key suppliers. Ex. BT, ¶¶35-37.

## II. JURISDICTION

The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(b)(2)(A), (E), (H) and (O).

## III. DISCUSSION

### A. Introduction

The Trustee contends that the APA transferred to nVidia 3dfx's *graphics business* or *business unit*, its *organized workforce*, and the economic goodwill *embedded in, attached to* or *associated with* that workforce. The Trustee's valuation expert contends these assets had a fair market value of at least $140 million. Accordingly, the Trustee claims the $70 million nVidia paid was not reasonably equivalent value for what it acquired.

nVidia argues that nVidia purchased only certain tangible and intangible assets and settled the Patent Litigation. According to nVidia's experts, these tangible and intangible assets and the settlement of the Patent Litigation had a fair market value of $13.4 million. nVidia paid $70 million for

[3dfx.nvidia.decis.4.08.]                    -30-

its own strategic reasons and because nVidia believed it was in a competitive bidding situation and needed to pay this amount to achieve its goals. nVidia asserts that it did not purchase a graphics business because, among other reasons, 3dfx did not have one at the time of the Transaction. nVidia also contends that it did not acquire an organized workforce through the Transaction because outside the APA, nVidia individually recruited only certain of 3dfx's former engineers whose employment was terminated by 3dfx. nVidia also argues that engineers are not assets under fraudulent conveyance analysis.

The Trustee's theory of this case appears to be premised in part on a belief that the basic deal structure agreed to by the principals of 3dfx and nVidia was fundamentally unfair. This belief turns on the fact that the Stock Consideration was only deliverable when 3dfx certified that its creditors had been paid and the fact that only $25 million of the Stock Consideration could be monetized to pay creditors. The Trustee argues that this structure favored shareholders at the expense of creditors and that nVidia knew the $70 million in Cash Consideration and the additional $25 million available from the Stock Consideration was insufficient for 3dfx to satisfy its Liabilities.[14]

The Court notes that the Trustee sued certain former

---

[14] Mr. Huang testified that it was 3dfx management that wanted the Stock Consideration. RT 510-513, 515-522. It is not clear from the record how or when the parties came to agree on the provision for monetizing part of the Stock Consideration.

[3dfx.nvidia.decis.4.08.] -31-

Case: 03-05079   Doc# 499   Filed: 04/30/08   Entered: 05/01/08 10:05:14   Page 31 of 41

officers and directors of 3dfx for breach of fiduciary duty. The Court approved the Trustee's compromise of those claims pursuant to which the Trustee received $5.5 million in exchange for complete releases. (See Ch. 11 case no. 02-55795-RLE, Docket nos. 480, 496.) The Court also notes that the Trustee did not establish that nVidia knew the available cash would be insufficient for its stated purpose at any relevant point in time.

**B. Applicable Law**

    **1. Civil Code § 3439, *et seq.***

The Trustee's Complaint is based on California Civil Code § 3439, *et seq.* applicable herein through Bankruptcy Code § 544(b)(1).

Civil Code § 3439.05 provides in pertinent part that:

> [A] transfer made by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer[.]

Cal. Civ. Code § 3439.05 (West 2008)[15].

The UFTA contains a number of definitions relevant to the Court's decision. Civil Code § 3439.01(i) provides that only transfers of "assets" are subject to avoidance. Section

---

[15] California fraudulent conveyance law and Bankruptcy Code § 548 are similar in form and substance and both may be analyzed contemporaneously. Accordingly, the Court has relied on cases decided under the UFTA, its predecessor, the Uniform Fraudulent Conveyance Act, and § 548 of the Bankruptcy Code. See Wyle v. C.H. Rider & Family (In re United Energy Corp.), 944 F. 2d 589, 594 (9th Cir. 1991).

[3dfx.nvidia.decis.4.08.]       -32-

3439.01(a) defines "asset" as "property of the debtor" and "property" is defined in § 3439.01(h) as anything that may be "subject of ownership." Id. Also, the property must be subject to enforcement of a money judgment. See Cal. Civ. Code § 3439.01, (Legis. Committee Comment, Assembly 1986).

## 2. Reasonably Equivalent Value

In determining whether a transfer has been for an exchange of reasonably equivalent value, the court analyzes all the circumstances surrounding the transfer. 5 Collier on Bankruptcy ¶548.05[1][b] at 548-35 (Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2002); see also Barber v. Golden Seed Co., Inc., 129 F. 3d 382, 387 (7th Cir. 1997) (applying Bankruptcy Code § 548 - reasonable equivalence should depend on all the facts of each case). In Sharp v. Chase Manhattan Bank USA, N.A. (In re Commerical Financial Services, Inc.), 350 B.R. 559 (Bankr. N.D. Okla. 2005), the court explained:

> Generally, the 'totality of the circumstances' test is fact-intensive and may include consideration of fair market value (which may be established by comparable sales, income production capacity or some other valid measure of value), the arms-length nature of the transaction, the economic circumstances and relationship of the parties, the maturity, competitiveness and efficiency of the market, industry standards, and other factors.

Id. at 577.

The phrase "reasonably equivalent value" is not defined in the UFTA or the Bankruptcy Code. As the court explained in In re Kemmer, 265 B.R. 224 (Bankr. E.D. Cal. 2001), defining reasonably equivalent value has been left to the courts:

> [t]here is no hard and fast rule in the Ninth Circuit as to what constitutes 'reasonably equivalent value.' The concept of 'reasonable equivalence' is not wholly

[3dfx.nvidia.decis.4.08.]                    -33-

> synonymous with 'market value' even though market value
> is an extremely important factor to be used in the
> court's analysis.

Id. at 232 (citation omitted).

Because the policy behind fraudulent conveyance law is to preserve assets of the estate, reasonably equivalent value is determined from the standpoint of the estate's creditors, it is not determined from the defendant's perspective. See Frontier Bank v. Brown (In re Northern Merchandise, Inc.), 371 F. 3d 1056, 1059 (9th Cir. 2004) (citing Harman v. First Am. Bank (In re Jeffrey Bigelow Design Group, Inc.), 956 F. 2d 479, 484 (4th Cir. 1992)) (primary focus is on the net effect of the transaction on the debtor's estate and the funds available to pay the unsecured creditors); Gill v. Maddalena (In re Maddalena), 176 B.R. 551, 555 (Bankr. C.D. Cal. 1995) (debtor's creditors suffered a significant net loss in comparing the value of what was transferred by debtor to the value of what he received in exchange); Pajaro Dunes Rental Agency, Inc. v. Spitters (In re Pajaro Dunes Rental Agency, Inc.), 174 B.R. 557, 578 (Bankr. N.D. Cal. 1994) (reasonable equivalence analysis is from perspective of creditors of the estate); In re Consol. Capital Equities Corp., 143 B.R. 80, 87 (Bankr. N.D. Tex. 1992) (citing Kirkland v. Risso, 98 Cal. App. 3d 971 (Ct. App. 1 Dist. 2 Div. 1979)) (applying California law, when analyzing the fairness of consideration the court assumes a creditor's perspective).

Finally, as the court noted in Pajaro Dunes, if it is necessary for a just result, the court may construe a segmented transaction as one transaction. In re Pajaro Dunes

[3dfx.nvidia.decis.4.08.]                    -34-

<u>Rental Agency, Inc.</u>, 174 B.R. at 584. The court need not allow the labels put on a transaction by the interested parties to control the rights of third parties. <u>Id</u>. at 584-85 (citing Douglas G. Baird & Thomas H. Jackson, <u>Fraudulent Conveyance Law</u>, 38 Vand. L. Rev. 829 (1985)).

### 3. Burden of Proof

Under both the UFTA and Bankruptcy Code § 548, the Trustee has the burden of proving the elements of a fraudulent transfer by a preponderance of the evidence. <u>Whitehouse v. Six Corp.</u>, 40 Cal. App. 4th at 534; 5 <u>Collier on Bankruptcy</u> ¶548.10 at 548-80.5.

While the burden of proof itself does not shift, during the progress of the case, the burden of going forward with the evidence to rebut a prima facie case may shift. <u>See Braunstein v. Walsh (In re Rowanoak Corp.</u>), 344 F. 3d 126, 131 (1st Cir. 2003) (burden of proof does not shift but duty of going forward may shift if trustee establishes prima facie case); <u>Whitehouse v. Six Corp.</u>, 40 Cal. App. 4th at 534 (applying UFTA, plaintiff has burden of proof but burden shifts to defendant upon threshold showing of less than reasonably equivalent value); 5 <u>Collier on Bankruptcy</u> ¶548.10 at 548-80.5-81.

To establish his prima facie case, the Trustee must prove what was transferred, that what was transferred is subject to avoidance under applicable law, and the fair market value of what was transferred or surrendered. By comparing the fair market value of the property transferred to what was received, the Trustee may establish that 3dfx did not receive a

[3dfx.nvidia.decis.4.08.]                    -35-

reasonably equivalent value in exchange.  See In re Maddalena, 176 B.R. at 553-54.

The Trustee contends that the Summary Judgment Order establishes his prima facie case that the *assets* transferred to nVidia had a fair market value of at least $108 million.[16] The Trustee also contends that he proved at trial that the *assets* actually transferred to nVidia included a workforce, intellectual property and goodwill with a fair market value of $140 million.  From this contention, the Trustee argues in his Post-Trial Brief that the burden shifted to nVidia to show "that assets not subject to the fraudulent conveyance law were included in the assets acquired and the value of those assets."  Docket no. 452, Trustee's Post-Trial Brief, p. 8.

The Summary Judgment Order does not establish the Trustee's prima facie case, nor does it shift the burden of production or burden of proof to nVidia.  The Summary Judgment Order simply says that nVidia may not claim that the *transaction value* is something other than $108 million.  To the extent this may be unclear, the Court may use its inherent authority to interpret its orders.  See In re Menk, 241 B.R. 896, 906 (9th Cir. BAP 1999) (citing Beneficial Trust Deeds v. Franklin (In re Franklin), 802 F.2d 324, 326-27 (9th Cir. 1986)); Koehler v. Grant, 213 B.R. 567, 569 (8th Cir. BAP 1997) (bankruptcy court retains subject matter jurisdiction to interpret orders entered prior to dismissal); see also In re

---

[16] This argument is based on the fact that nVidia stated $108 million in the HSR Notification.

Case: 03-05079   Doc# 499   Filed: 04/30/08   Entered: 05/01/08 10:05:14   Page 36 of 41

<u>United States Brass Corp.</u>, 255 B.R. 189, 192 (Bankr. E.D. Tex. 2000), <u>aff'd</u> 301 F. 3d 296 (5th Cir. 2002) (bankruptcy court has jurisdiction to clarify and enforce its own orders). The Court's Summary Judgment Order does not set a floor of $108 million for valuation purposes and does not shift the burden of production or proof to nVidia.[17] It simply provides that nVidia may not claim that the *transaction value* is something other than $108 million and nVidia does not make such a claim.

**4. Valuation Principles**

In dealing with the conflicting views of the valuation experts, this Court finds the analysis of the court in <u>Peltz v. Hatten</u>, 279 B.R. 710, 737-738 (D. Del. 2002), <u>aff'd sub nom.</u>, <u>In re USN Comm., Inc.</u>, 60 Fed. Appx. 401 (3rd Cir. 2003) both wise and instructive:

> First, it is clear that experts and industry analysts often disagree on the appropriate valuation of corporate properties, even when employing the same analytical tools such as a [discounted cash flow] analysis or a comparable sales method. Simply put, when it comes to valuation issues, reasonable minds can and often do disagree. This is because the output of financial valuation models are driven by their inputs, many of which are subjective in nature. . . . Second, in determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values. When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight.

<u>Id</u>. at 737 (citations omitted). This Court will view the

---

[17] <u>See</u> Declaration of John Sipple filed in support of nVidia's Opposition to Trustee's Motion for Summary Judgment explaining context for the HSR Notification and how it is used to assess potential impact on competition. Docket no. 139.

[3dfx.nvidia.decis.4.08.]                          -37-

evidence on fair market value and reasonably equivalent value through this philosophical lens.

The valuation experts, Roger Grabowski[18] for nVidia, and Michael Wagner[19] for the Trustee, had appropriate credentials for the task and agreed on many fundamental valuation principles. Mr. Wagner and Mr. Grabowski agreed that the overarching objective of the valuation exercise was to predict the most probable price at which the assets would have been sold in the applicable competitive open market on the valuation date under conditions requisite to a fair sale. They both defined fair market value as the price expressed in terms of cash equivalents at which property would change hands between a hypothetical willing and able buyer and a hypothetical willing and able seller, acting at arms length in an open and unrestricted market, when neither is under compulsion to buy or sell and both have reasonable knowledge of relevant facts. Ex. 43, ¶6; Ex. BW, ¶11; RT 918-924.

Mr. Grabowski and Mr. Wagner also agreed that Robertson Stephens had done a competent and thorough job of seeking out any and all investors or purchasers for 3dfx, in whole or in part, and would have been able to solicit the most likely prospective buyers or investors in the market as it existed at

---

[18] See Appendix C to Ex. BW for complete details regarding his credentials. In brief, Mr. Grabowski is Managing Director, Standard and Poor's Corporate Value Consulting, Chicago.

[19] See Ex. 2 to Ex. 43 for complete details regarding his credentials. In brief, Mr. Wagner is Senior Advisor at Charles River Associates, Inc.

[3dfx.nvidia.decis.4.08.]                    -38-

that time.  In other words, they agreed that an appropriate market exposure had taken place.  Ex. Q, pp. 4, 14-15; RT 925-929.  See also Ex. AC, pp. 9-14.

**5. The Use of Generally Accepted Accounting Principles**

One of the cornerstones of the Trustee's theory of this case is that nVidia accounted for the Transaction as the purchase of a business under generally accepted accounting principles ("GAAP") so the Court must find that the Transaction was the purchase of a business for fraudulent conveyance purposes.[20]

Parties to avoidance actions who have taken the Trustee's approach that GAAP dictate a bankruptcy court's determination of solvency, have generally been unsuccessful.  See Arrow Electronics, Inc. v. Justus (In re Kaypro), 230 B.R. 400, 413 (9th Cir. BAP 1999) aff'd in part rev'd in part, 218 F. 3d 1070 (9th Cir. 2000) (GAAP relevant but not controlling in insolvency determinations); Sierra Steel, Inc. v. Totten Tubes, Inc. (In re Sierra Steel, Inc.), 96 B.R. 275, 278 (9th Cir. BAP 1989) (court is to make determination of solvency, not accountants and board which promulgates GAAP); Kendall v. Sorani (In re Richmond Produce Co., Inc.), 151 B.R. 1012, 1019 (Bankr. N.D. Cal. 1993), aff'd, 195 B.R. 455 (N.D. Cal. 1996)

---

[20] In 2002 nVidia told the SEC: "The purchase of certain assets of 3dfx constituted the purchase of a 'business' as defined by EITF 98-3 . . .[the engineers] had the ability to continue business activities they conducted before the acquisition. . . nVidia obtained the critical elements of a business (i.e., long lived assets, intellectual property, trademarks and an organized skilled workforce . . ." Ex. 5086.

Case: 03-05079   Doc# 499   Filed: 04/30/08   Entered: 05/01/08 10:05:14   Page 39 of 41

(GAAP do not control solvency determination, solvency inquiry must be to what extent an asset would have value for a creditor attempting to satisfy its claim, goodwill can not be sold to satisfy creditor's claim).

In EBC I, Inc. v. America Online, Inc. (In re EBC I, Inc.), 380 B.R. 348 (Bankr. D. Del. 2008) both parties in a fraudulent conveyance action cited to IRS Revenue Procedure 77-12 to support their arguments about valuing the inventory of a retail business for solvency purposes (i.e., was it appropriate to use book value or to make an upward adjustment because the inventory was to be sold at retail?). In dismissing the arguments that the Revenue Procedure provided an answer, the court found the "Revenue Procedure, like [GAAP,] to be unhelpful because the tax and accounting implications of how assets are listed on a company's balance sheet often have little to do with what a willing buyer and willing seller would agree is the fair market value of those assets." Id. at 357, n.3.

The parties in EBC I also disagreed regarding the relevance of GAAP treatment of preferred stock. The court found that GAAP was irrelevant to the question before it.

> GAAP does not deal with the true market value of assets
> or the determination of what are legal liabilities of a
> company. . . Just as GAAP rules regarding the book value
> of assets does (sic) not determine their fair market
> value, similarly GAAP rules for treating debt as equity
> and vice versa are not relevant in determining whether
> they are truly debt or equity.

Id. at 358 (internal citations omitted).

[3dfx.nvidia.decis.4.08.]                    -40-

The opinion of Roman Weil,[21] nVidia's accounting expert, is consistent with this position. In explaining why nVidia used purchase accounting for the Transaction, he stated:

> GAAP provide that if the acquirer purchases enough assets so that it could readily, that is with minor effort and cost, purchase additional assets to have a stand-alone business, even if it has not, then the acquirer should use purchase accounting for the assets it did purchase. GAAP do not mean, by applying the purchase accounting rule, that the asset purchase must have resulted in the purchase of a business as that term is used in non-technical language or that the transaction was an acquisition of all the assets and liabilities of the company. nVidia's accountants invoked purchase accounting in order to explain why it used fair values, instead of book values, and why it recorded goodwill for the transaction.

Ex. N, p. 9.

For purposes of the issues to be decided here, this Court believes that the positions taken in Kaypro, Sierra Steel, Richmond Produce and EBC I in the context of solvency determinations are applicable. GAAP or SEC rules will not be used to exclude facts or the required analysis of those facts, or to supplant the Court's fact finding role in this context. GAAP will not determine what constitutes an asset or the fair market value of an asset. The Court's determination of what constitutes an asset will be guided by the applicable UFTA definition, not the accounting definition.[22] The evidence

---

[21] See Exhibit 1 to Ex. N for complete details regarding Mr. Weil's qualifications as an expert on accounting issues. In brief, he is a professor of accounting at the Graduate School of Business of the University of Chicago.

[22] Statement of Financial Accounting Concepts No. 6 defines assets as probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events. Elements of Financial Statements,

[3dfx.nvidia.decis.4.08.]                    -41-